(No. 2359— ▮▮▮▮▮)

SAMUEL M. SMITH, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed March 9, 1937.*

A. C. and B. F. ANDERSON, for claimant.

OTTO KERNER, Attorney General; JOHN KASSERMAN, Assistant Attorney General, for respondent.

Mr. Justice Linscott delivered the opinion of the court:

This is a claim filed under the Workmen's Compensation Act and alleges that the claimant, while an employee of the State, under the Division of Highways, was injured on September 19, 1933; that at the time of the injury he was pushing a cement cart, used in road repairs, about three miles southeast of Charleston, Illinois; that the injury was caused by one J. W. Hardway, not an employee of the State, running a truck against the claimant.

The claimant received a fracture of the fifth sacral vertebra, and a fracture of the lower ramus of the pelvis.

It appears from the file that Hardway, at the time of the injury to claimant, was operating his own truck and was insolvent. Claimant was struck at the lower end of the spine and undoubtedly received a severe injury, and he claims that he has not been able to engage in any occupation since the injury.

It is stipulated that all parties are under the Act and that the injury arose out of, and in the course of claimant's employment.

At the time of claimant's injury, he was thirty-six years of age, and resided with his wife and four children, under

the age of sixteen years. Since that time two more children have been born, and the question for this court to determine is the extent of the injuries and the amount that claimant should receive.

It appears that the State has paid medical expenses in the amount of $115.00, of a bill of $143.50, to the attending physician, leaving a balance unpaid in the sum of $28.50, which is due to the estate of Dr. C. H. Harwood, Dr. Harwood having died since claimant's injury.

At the time of the injury, claimant was earning $12.00 per week, and compensation has been paid to April 1, 1934, in the amount of $159.00.

Claimant contends that prior to the injury he was in good health and had not had any illness of any nature, and as the result of the injury, he was confined to his bed about six weeks, and to his home for several months, and always has an ache across his back, and that the ache continues in the back of his head; that he has a limp in the right leg, but that does not pain him; that he has endeavored to work and has worked some in his garden and washing. The record does not state what was meant by the word "washing", but we assume it means washing dishes and clothes. He further testified that when he works to amount to anything, he has an ache that comes up his back on the left side into the back of his head and makes him very sick; that he can lie down an hour or so and he will get relief; that he then will work more and lie down a while, and so on. He states that since the injury, he has pulled brush and chopped saplings, but the ache comes up his back and into his head; that when he laid down for an hour or half an hour or two hours that the ache would leave. In more recent testimony, he says that he does not take any medicine, and says that he has to go in a half stooped position "in order to hold the ache down". He testified that last fall he cut some broom corn when he was able, and that he had the same ache, and would have to lie down in the broom corn field for an hour or so; that then he could get up and continue to work and then was required to lie down an hour again; that since the accident, he has not been able to do any continuous physical labor; that during the last year or two, he has earned fifteen or twenty dollars from labor.

Claimant further testified that since Dr. Harwood's death, he has employed Dr. Alexander. He further testified that his head hurt him the same as his back; that he had a pain in the back of his head. Claimant testified that he did not get sick in the stomach: "I just get sick, my flesh. When I have an ache in my back from stooping why it makes me sick, just like I was sick to the stomach only it is in my flesh, makes me deathly sick. I have to go lay down. I go and lay down and lay there until it wears off, probably an hour or half hour." He was then asked: "How many times have you had to rest during the week from attempting to perform labor since the last hearing to the best of your remembrance?" To that he did answer: "I would say three times a week, because I wash twice." He further testified that he helped with the housework and that the weakness above referred to would last probably an hour, but when he would lie down, it would wear off, but he said "That pain in the back that always stays there." He further testified that when he got up and moved around the pain would come back again.

Claimant further testified that when he worked he got nervous; that he couldn't sleep nights; that he had nervous spells; that when he would go to bed he couldn't lie there; that he had to get up and move around; that he had never been able to sleep on his back or left side; that he could sleep on his right side, and always has, meaning since the accident.

This testimony was taken about two years or a little more after the accident.

On cross examination claimant testified that he went to his neighbors and pulled weeds out of the strawberry gardens, but was not paid by the day. He received whatever compensation the owner of the strawberry patch saw fit to pay him.

Claimant further testified that his left leg was not affected, and neither was his arms nor shoulders; that he had a limp caused by a little stiffness in the knee.

Dr. Swickard testified that he was engaged in the general practice of medicine and surgery in Charleston, Illinois, and had been so engaged for about twenty years. He testified that he had been in court and heard all of Smith's testimony,

and several hypothetical questions were put to the doctor, based upon that testimony. He further testified that he had examined the claimant a day prior for the purpose of qualifying himself to testify; that there is no fixation of the knee joint, but whenever claimant walks rapidly he stiffens his knee and it appears that there may be some tilting of the pelvis as he walks, but he could not explain why it was that way; that he examined the X-ray pictures taken of the claimant's hips, and the pictures disclose a fracture across the fifth sacral vertebra, and a fracture of the right lower ramus of the pubis; that there was a large amount of callus on the right side of the fracture, and that the fracture of the sacrum had healed; that he palpated over the area which had been painful at the previous examination and that he could only elicit pain over the lower part of the back; that the region around the pubis was non-painful at this examination; that he had the claimant do some bending and that he could bend fairly well, and in the opinion of the doctor, the twisting of the pelvis when he bends, was the result of the crushing injury to his pelvis; that all other examinations of the heart and lungs were negative. This doctor also testified that there was no nerve running directly from the lower part of the spine up to the head; that the feeling claimant had in the back of his head was because of the pain lower down in the back going into the nervous center up to the base of the brain, and that the claimant only thought that the pain went through the back but that was impossible, but that would be true of any individual who had an injury such as the claimant had.

It is strenuously contended in this case that the claimant has suffered total and complete disability arising from the accident. The same physician testified that he had examined the claimant on March 5, 1936, at his office; that that was the day before the testimony was taken. The physician was asked several hypothetical questions, which were improper. The first question was as follows:

"Assuming that the injury happened as related here by Mr. Smith and his pelvis was crushed and injuries were made to the bones in that region as testified to at a former hearing by you, from your examination of the X-rays and from what testimony you have heard Mr. Smith relate here

this morning with reference to this injury, have you an opinion what causes this pain that has been related by him, what is that?''

It will be noted that the question referred to the testimony by Mr. Smith, the claimant, which has in part been hereinabove set forth. In answer to the question the doctor testified that he believed that the pain and consequential disability is due to and resulting from the crushing injury which caused these fractures and the pressure upon the surrounding tissues, surrounding muscles and nerves. Again he was asked on direct examination:

''Assuming that all the testimony that has been given here this morning by Mr. Smith is true and assuming that his injuries are or have been sustained as narrated by him and assuming that his pelvis bone has been broken and one of the vertebra as shown in the X-ray pictures heretofore introduced in evidence in this cause, and assuming all these facts to be true, have you an opinion whether or not, based on a reasonable degree of medical certainty, this man's present physical condition results from the injury assumed in the question?''

To this he stated that he had an opinion and believed that his condition was a direct result of the injury. Again reference is made to the testimony of Mr. Smith, which included his testimony concerning aches, pains and sickness, etc. Again the physician was asked:

''Have you any opinion about when this man, assuming that the facts are true, would be able to do any labor that he is physically or trained to do?''

The witness answered that he had such an opinion, and when asked what it was he replied:

''I don't believe he will ever be able to do the work that he did previously.''

He was then asked:

''Not from your separate investigation, but from what you have heard here from Mr. Smith, assuming those facts are true and connecting with your examination of the exhibits, is your opinion that you have given here been based on that only?''

The witness answered:

''Based on the whole picture as I understand it''.

On cross examination he testified that in his opinion the right pelvis was tilted, and inclined a little to the right side. The doctor stated that when the patient walked slowly everything apparently shows just all right; that when he goes a little fast he gives down. He then stated that the left side appears to be a little higher; that the fractures that the claimant suffered were straight fractures. He was further asked on cross examination:

"In your opinion what was the cause of that tilting if simple fractures that have healed or knitted perfectly?"

The witness answered:

"I could not explain that to my own mind. I don't know exactly just why. You have a feeling when you watch him walk that there might be a little shortness of that limb, but when he stops and stands up straight there isn't. I am not quite certain why he gives down on that side."

He was further asked on cross examination:

"Just what, in your opinion, is that permanent disability around the pelvis?"

The witness answered:

"That is what I could not satisfy my own mind. I can not tell just exactly what causes it. I do know it is the result of the soft tissues being injured at the time he was hurt, and those ligaments torn across the back. At the time he was told the ligaments were torn across the lower part of his back. I feel sure they must have been. The muscles and nerves must have been actually bruised and that is what he has not recovered from. The fractures have healed with an over-production of callus where the right remus of the pelvis was fractured. Usually nature absorbs this callus. This excessive callus which formed during the healing causes pressure over this area, and explains the pain and trouble he has in his lower back."

The witness also testified that in his opinion Mr. Smith's suffering is the result of the injury to the soft parts rather than the bone itself. When he was asked if he could be more specific as to what muscles or tendons, tissues and nerves were injured, he answered:

"It is hard to tell just how many, but I believe the larger part of the muscles, nerves and tendons around the regions of both fractures were injured to such an extent that nature

will never be able to repair them so that the man can go ahead as he normally did. I could not specify any one special group of muscles or nerves. The injury was clear across the lower part of the spine, clear across the fifth sacral vertebra."

The doctor was then asked:

"Doctor, have you an opinion as to why the pain apparently is only on one side of the back, that is the left side?"

To this he answered:

"What I really thought about it I thought that probably due to the fact that there had been some injury to the left sacral iliac joint, that is where the pain originates and the soreness travels from that clear across the whole area, which does happen so many times with back injuries. That this pain that comes in his head is just a nervous reaction from his general nervous system because of the trouble in his back."

Paragraph (i) of Section 8 of the Compensation Act in part provides as follows:

"Provided, further, that all compensation payments named and provided for in paragraphs (b), (c), (d), (e) and (f) of this section, shall mean and be defined to be for injuries and only such injuries as are proven by competent evidence, of which there are or have been objective conditions or symptoms proven, not within the physical or mental control of the injured employee himself."

This was an amendment made to the Act of 1925 and its objects and purposes are obvious.

The Supreme Court of this State in the case of *Madison Coal Corporation* vs. *Industrial Commission,* 320 Ill. 65, said at page 68:

"It was also error to permit the medical witnesses to detail complaints of the patient in his manifestations of pain, which were within his control, and then express an opinion as to the patient's condition based thereon. *Wells Bros. Co.* vs. *Industrial Com.,* 306 Ill. 191".

The accident in the Madison Coal Corporation case, supra, occurred March 23, 1923.

In *Wells Bros. Construction Co.* vs. *Industrial Com.,* 306 Ill. 191, a nerve specialist testified that on examination the applicant related to him facts of the accident and the condition of which he complained, as to pains in the back of the head and neck, nervousness, dizziness, noises in his ears,

soreness in the head, weakness in the legs, and that he stumbled at times in walking. The doctor testified he found scars on the side of the head, a slight curvature of the spine, tenderness over certain vertebrae, a limited motion of the neck, that on bending the head backward the patient falls, that bending of the body forward caused dizziness, that the grip of the hand was impaired, and there were sensory disturbances, etc. There were objections that testimony was based upon subjective rather than objective conditions. The court said on page 199:

"This court has more than once held that the testimony of physicians is incompetent which is made after examination of the applicant with a view to testifying and is based wholly upon the physician's observation of outward manifestations within the applicant's control, such as pressure or twisting of the hands or turning in of the toes, (*Greinke* vs. *Chicago City Railway Co.*, 234 Ill. 564; *Casey* vs. *Chicago City Railway Co.*, 237 id. 140.) This court has also held that when the physician's statement is based partly upon his own observation and partly upon the statement of the case made by the injured person such evidence is not admissible. (*Chicago Union Traction Co.* vs. *Giese*, 229 Ill. 260). Therefore it is clear that the testimony of Dr. Comes, so far as he testified it was based 'only of his (Lydon's) actions and statements,' was inadmissible. It seems also clear from the reading of Dr. Rydin's testimony that he based his conclusion partly upon the statements of the subjective symptoms made to him by his applicant. What was said by this court in *Schmidt* vs. *Chicago City Railway Co.*, 339 Ill. 499, *International Coal Co.* vs. *Industrial Com.*, 293 id. 524, *McKenna* vs. *Chicago City Railway Co.*, 296 id. 314 and *Central Illinois Service Co.* vs. *Industrial Com.*, 302 id. 27, does not in any way modify the conclusions reached by this court in the decisions already cited, as to the physician not being authorized to base his conclusions as to the person's injury in part upon objective symptoms and in part upon subjective symptoms derived from the patient's statements to the physician."

These decisions were prior to the amendment of 1925 above referred to and it is fair to conclude that the purpose was to stop an evil that was developing in the administration of the Compensation Act and to make a legislative declaration that compensation should be payable only in cases where the injury was established by competent evidence of which there are or have been objective conditions or symptoms proven, notwithstanding the physical or mental control of the injured employee himself. There have been numerous cases in which the court reversed awards of permanent total disability as being contrary to the manifest weight of the evidence and even on the ground that there was no evidence to support the award but in which the applicant had testified

to great pain, inability to eat or sleep or to lift as much as a bucket of coal and in which there was competent evidence that there was no objective indication of any disability.

From an examination of the claimant himself, it is obvious to the fair-minded that he made exaggerated statements and groundless assertions that have no foundation, in fact are not the character of evidence which the law recognizes as worthy to support any legal finding.

Certainly this court would be lacking in experience if we closed our eyes to give cases that have come under our personal observation where an applicant, with little or no indication of injury testifies in substance to pain and condition of disability or of total inability to work and in which medical experts in answer to hypothetical questions express opinions of permanent total disability but shortly after the settlement is made they return to work and earn full wages. Such conditions are contrary to the intents and purposes of the Act and are a fraud not only upon the State, but necessarily upon the taxpayers who bear the costs.

Dr. John R. Alexander also testified for the claimant. He testified that he had examined the claimant recently, and that there was a very slight improvement. He was asked directly what claimant had told him with reference to his pain and suffering, and he answered:

"He says he has the same symptoms that he had at the time of the previous examination."

He was then asked if he knew what those symptoms are, and he answered:

"He says that his back aches and that when he bends over or does any work in which he uses his back and bends over that the pain shoots up his back into his head and that he then has to lie down for probably thirty minutes to an hour, then he will get all right and get up and try it again. He repeats this process once or twice and then is laid up a day or couple of days."

Q. That is what he told you?

A. Yes.

Claimant also told the prior witness that he could take long walks and enjoy them without suffering. Dr. Alexander stated that his opinion concerning the claimant was practically the same as Dr. Swickard's, and that he knew from his observations and the claimant's complaints that he must have

had some very severe traumatisms to the ligaments and tissues at the site of the fractures. He was asked if in his opinion the same condition now exists with reference to pain and suffering from his observation and from what he told you, and he replied that the initial injuries have healed, but when you have traumatisms of the tissues they heal with scars; that you have those scar tissues left which cause the trouble. He further testified that claimant's legs were practically the same; that there was a negligible amount of atrophy of the muscles. He was again asked:

"Now, doctor, based upon your examination of Sam Smith and the X-rays that were taken and heretofore introduced in evidence and from what he has told you as his physician, have you an opinion now as to what the nature and extent of this man's injuries are now at the present time?"

To this he answered that he had an opinion and that it was based on a reasonable degree of medical certainty; that he has healed fractures over his fifth sacral vertebra and pelvic bone along with pain on pressure over these areas, over these sites of the fractures; that is about the only objective symptom that he could elicit other than the limp he has when he walks or tries to climb stairs.

Other similar questions embracing like matters were asked and it is unnecessary to go further in this behalf, and what is said in this regard pertaining to the testimony of Dr. Swickard, applies with equal force to the testimony of Dr. Alexander.

A stipulation in this case was also entered into, which is as follows:

"It is hereby stipulated and agreed by and between the above claimant, Samuel M. Smith, by A. C. and Ben F. Anderson, his attorneys, and the above respondent, by Otto Kerner, its Attorney General that:

1. Dr. H. B. Thomas is a resident of Cook County, State of Illinois and a practicing physician and surgeon in the City of Chicago.

2. That Dr. H. B. Thomas is professor and head of the Department of Orthopaedic Surgery, University of Illinois, College of Medicine and Senior Orthopaedic Surgeon of St. Luke's Hospital.

3. That Dr. H. B. Thomas examined the claimant, Samuel M. Smith, on May 5, 1936 in his office at Chicago, Illinois.

4. That Dr. Thomas made a report as follows:

. "Henry Bascom Thomas, M. D., Chicago.
May 11, 1936.

Mr. M. K. Lingle,
Division of Highways,
Springfield, Illinois
Dear Mr. Lingle:

In regard to Mr. Samuel Smith, whom I examined 5-5-'36, three years ago while pouring curbing he was hurt by a truck. He was taken to the doctor's office and then home. He lay in bed for awhile and later was X-rayed. His back was taped. He has had no cast or brace.

He complains of pain in a spot on the lower left back over the sacro-iliac and in a region in the neighborhood of the 7th cervical vertebra. He has a scar over the right lower buttock. Straight leg raising is negative. He does not stoop well or bend sideways easily. No particular sensitiveness on pressure.

Appearance healthy.

We X-rayed sterioscopically the lower lumbar and sacro-iliac area including the pelvis and heads of both femora. There is an area of definite sclerosis of the 4th and 5th lumbar vertebrae and left sacro-ilias joint. There is an occult spina bifida. Films of the upper cervical region show no evidence of pathology.

There is no evidence now of, "Fracture of the right ischium or inferior osseous ramus or of the 5th lumbar vertebra."

I believe Mr. Smith shows results clinically and roentgenologically of severe traumatism around the lower lumbar vertebrae and left sacro-iliac joint.

I recommend that he have physiotherapy cautiously directed and a sacro-iliac belt. This treatment should be carefully administered, predicting that he will improve gradually. If he does not, then an operative fusion is recommended.

His disability at present is 35%.

This patient has a fair chance of returning to normal with proper orthopedic treatment, elimination of all focal infection and his proper attitude toward his condition.

(Signed) H. B. Thomas."

5. That the claimant does not wish to accept the treatment suggested in the doctor's report as he feels it will be of no benefit to him on advice of physicians.

It will be noted under Paragraph 4 on the preceding page that the stipulation only goes so far as to say that Dr. Thomas made a report as follows: That the claimant's disability at present is 35%, and that he has a fair chance of returning to normal, etc.

The per cent of loss that claimant suffered goes to the ultimate fact. An injured employee may testify how his in-

juries affect him and as to his ability to use injured eyes or limbs, but neither a lay witness nor an expert can testify in direct terms that the employee has lost any stated per cent of the use of any member, as such conclusion or finding must be made by the court itself. *Pocahontas Mining Co.* vs. *Industrial Com.,* 301 Ill. 462; *St. Louis Smelting Co.* vs. *Industrial Com.,* 298 Ill. 293. This is a well established rule and the stipulation does not go so far as to say that it is stipulated that the claimant is injured to the extent of 35%.

The testimony introduced pertaining to the ability of claimant to work was to the effect that he could not work as a laborer, that being his business prior to the time of the injury. On a hearing under paragraph (d) of Section 8, it is necessary to acquire proof of the actual earnings of the claimant for a substantial period before the accident and of the actual earnings of the claimant for a substantial period after his return to work after the accident, or in the event that he has not returned to work since the accident, proof of what he is able to earn in some suitable employment or business. (*Groveland Coal Co.* vs. *Industrial Com.,* 309 Ill. 73.) The finding of a difference in earning capacity must find support in the evidence heard or it cannot be confirmed. It is impossible to award half the difference between the average amount of earnings before the accident and the average employee is earning or is able to earn in some suitable employment or business after the accident without evidence not only of the earnings of the injured employee before the accident but also of his capacity to earn after the accident.

After consideration of all the competent evidence in this case we are unable to determine the period of temporary total disability and manifestly can make no award thereon. It is equally clear that a person who has done and can do those things the claimant testified that he has done since his injury, is not rendered wholly and permanently incapable of work. It is apparent that claimant did receive some injuries that have rendered him partially disabled but the proper foundation has not been made for this court to determine the amount which should be awarded for such disability. Award is therefore denied. On proper petition further proceedings may be had in conformity with the Workmen's Compensation Act.